Signed and Filed: June 3, 2013



_____
**DENNIS MONTALI**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br>GREG JAMES VENTURES LLC,<br>                  Debtor.<br>_____<br>MEYERS LAW GROUP, P.C.,<br>                  Plaintiff,<br>v.<br>DIVERSIFIED REALTY SERVICES, Inc;<br>JACK KRYSTAL,<br>                  Defendants.<br>_____ | Bankruptcy Case<br>No. 07-11434DM<br><br>Chapter 7<br><br>Adversary Proceeding<br>No. 12-3030DM |

## MEMORANDUM DECISION FOLLOWING TRIAL

### I.  STATEMENT OF FACTS[1]

Plaintiff Meyers Law Group, P.C. ("MLG") was counsel for former debtor-in-possession Greg James Ventures LLC ("Debtor"), a car dealership that filed chapter 11 on November 5, 2007. Defendant Diversified Realty Services, Inc. ("DRS"), which is owned by defendant Jack Krystal ("Krystal"), provided debtor-in-

---

[1] The following discussion constitutes the court's findings of fact and conclusions of law.  Fed. R. Bankr. P. 7052(a).

-1-

possession financing to Debtor pursuant to a loan agreement negotiated beginning that same month ("Loan Agreement") and approved by the bankruptcy court (Jaroslovsky, J.) in a third interim order approving postpetition financing dated November 30, 2007 ("Interim Order") and a December 20, 2007 final order (collectively, the "Orders").[2] Pursuant to the Loan Agreement and Orders, DRS obtained a security interest in Debtor's personal property and real property lease and a superpriority expense claim for amounts it advanced to Debtor.

Section 2.13 of the Loan Agreement states that DRS' liens and security interests, "will be subordinated only to the extent specifically provided in the Interim Order, which shall include a subordination to the prior payment of or provision for such fees and expenses of professionals retained by the Debtor or the Committee as are allowed by the Court." Section 2.14 of the Loan Agreement states that "[n]othing herein is intended to be or shall be construed to obligate [DRS] to pay or cause to be paid any fees or costs of [Debtor's] counsel" or "impose any duty or resposibility on [DRS] (including, without limitation, any fiduciary obligation) with respect to payment or non-payment of any claims" or "subordinate [such claims] except to the extent specifically set forth in the Interim Order." The Interim Order does not explicitly provide for such subordination, although it did incorporate the terms of the Orders, which did include subordination provisions.

---

[2] The the earlier interim orders involved lenders other than DRS, but the Interim Order provided that the terms of those orders "shall remain in full force and effect, as amended by the terms of this order."

-2-

DRS advanced funds to Debtor in the approximate amount of $2.3 million,[3] and Debtor made three repayments totaling about $499,000 to DRS: $149,307.14 on January 24, 2008, ("January Payment"); $200,000 on February 4, 2008, ("February Payment"); and $150,000 on April 22, 2008, ("April Payment") (collectively, the "Cash Repayments"). In addition, in November 2008, DRS took possession of a Mercedes (the "Transferred Vehicle") owned by Debtor in partial repayment of its loans to Debtor.

On April 30, 2008, the bankruptcy court allowed interim compensation to MLG in the amount of $262,672.09; on December, 8, 2008, the court allowed additional interim compensation to MLG in the amount of $484,644.99. MLG received only a small portion of its fees from the Debtor.[4]

On February 24, 2012, MLG filed this adversary proceeding against DRS and Krystal,[5] alleging that pursuant to the Loan Agreement, DRS had agreed to subordinate repayment of its loan to MLG's fees and expenses. Among other things, it sought recovery of the Cash Repayments and the value of the Transferred Vehicle. On July 31 and August 10, 2012, the court entered orders granting the relief sought in MLG's first and third claims for relief. See

---

[3] According to Krystal, DRS' president, DRS made twelve advances in a five-month period, with the first advance occurring on November 30, 2007, and the last on May 1, 2008.

[4] The evidence is confusing as to exactly how much MLG received, but its unpaid allowed fees exceed the Cash Repayments by a considerable amount.

[5] The claims against Krystal are alter ego claims. The court severed those claims from those against DRS, as a determination of alter ego liability would be unnecessary if DRS prevailed on its defenses to MLG's claims at trial.

-3-

Docket Nos. 30 & 35. The August 10 order pertained to MLG's first claim for relief, in which it sought a declaratory judgment that DRS had subordinated its rights of repayment to payment of MLG's fees pursuant to the Loan Agreement and Orders. On February 4, 2013, the court clarified its prior ruling by noting that DRS breached the Loan Agreement, and in particular MLG's rights under Section 2.13, by not providing for its unpaid fees.

After that, all that remained for trial beginning on February 19, 2013, was: (1) a determination of damages, if any, MLG could recover from DRS under the second claim for relief for DRS's violation of MLG's rights under the Loan Agreement and Orders; and (2) two remaining affirmative defenses raised by DRS, namely whether MLG defrauded DRS or Krystal in connection with the Loan Agreement and Orders and whether all or any of its claims were barred by the statute of limitations.[6]

Trial was conducted as scheduled, witnesses were heard and documents received in evidence, and counsel presented argument. After the close of evidence on February 26, 2013, the court directed MLG and DRS to submit post-trial briefs on the statute of limitations issue, which they did.

For the reasons set forth below, the court agrees with DRS that the statute of limitations bars any claim of MLG to the amount of the January Payment or the February Payment. The April Payment was made by Debtor to DRS within four years of the date

---

[6] At that time this adversary proceeding was filed, MLG was holding approximately $150,474.69 in its trust account, and on February 4, 2013, the court issued an oral order granting MLG's motion for partial summary judgment as to the third claim for relief allowing it to apply the funds in the trust account against its accrued fees.

-4-

this adversary proceeding was filed, and thus the court agrees with MLG that it is entitled to recover that amount plus interest at the rate of 7% from April 22, 2008.

## II.  DISCUSSION

A.  <u>Statute of Limitations</u>

California has a four-year statute of limitations for breach of contract actions.  Cal. Code of Civ. Pro. § 337(1).  "A cause of action for breach of contract accrues at the time of the breach and the statute of limitations begins to run at that time regardless of whether any damage is apparent or whether the injured party is aware of his right to sue." *Perez-Encina v. AmerUs Life Ins. Co.*, 468 F. Supp. 2d 1127, 1134-35 (N.D. Cal. 2006), *citing Niles v. Louis H. Rapoport & Sons*, 53 Cal. App. 2d 644, 651 (1942).

While the courts have carved out exceptions "where it is manifestly unjust to deprive plaintiffs of a cause of action before they are aware that they have been injured" (*Moreno v. Sanchez*, 106 Cal. App. 4th 1415, 1423 (2003)), this is not such a case.  MLG drafted the DIP financing documents, it knew about the Cash Repayments, and it knew that it had already incurred fees in excess of $127,000 and that it had not been paid.  The breaches occurred when DRS received the Cash Repayments without first providing for or setting aside funds for MLG.  At a minimum, MLG was placed on inquiry notice; it could have confirmed with DRS that sufficient funds had been set aside for payment of its fees.

MLG has repeatedly asserted that the subordination clauses contractually obligated DRS to turn over or set aside the repayments so that MLG could recover its fees.  For example, in

-5-

its motion for summary judgment on the second claim and all affirmative defenses, MLG states that "DRS' first breach of its subordination obligation occurred when it received the [January Payment] on January 24, 2008[.]" *Plaintiff's' Motion for Summary Judgment on the Second Claim and all Affirmative Defenses* at Docket No. 60 at 37:7-9. MLG reinforced this position at the oral argument on the motion on January 31, 2013, stating that when DRS received the repayments (e.g., on January 4 and February 4, 2008), it was "obligated" to "make provision" for MLG's fees. These statements by MLG foreclose any arguments asserted later in its post-trial brief that the breach did not occur until the bankruptcy court approved its fees in April 2008.[7] In fact, MLG

---

[7] MLG reiterated in several contexts its initial position that DRS breached its obligations by failing to set aside funds for MLG at the time DRS received the repayments:

- Arguing that the Cash Repayments constituted the res of a trust, DRS "clearly acted wrongfully in taking and retaining the res, inasmuch as it did so in derogation of [MLG's} right to prior payment." *Plaintiff's Motion for Summary Judgment on the Second Claim and all Affirmative Defenses* at Docket 60 at 24:16-20. "Under the terms of Section 2.13, DRS was obligated to subordinate its lien and make provision for payment of [MLG's] fees and costs from its collateral, before paying down its DRS DIP Loan[.]" *Id.*

- "Whereas the Debtor's repayments to DRS may not have breached any of DRS's obligations to the Debtor, they most certainly breached DRS's obligations to the Plaintiff." *Plaintiff's Opposition to Defendants' Motion for Summary Adjudication or Reconsideration,* Docket No. 40 at 2:18-23. "[R]etaining the payments without turning them over to the Plaintiff was 'in derogation of Plaintiff's rights[.]'" *Id.*

- "DRS was obligated to turn over those repayments to the Plaintiff, pursuant to DRS's subordination to [MLG], and its failure to do so was a clear breach of its performance under the DRS Loan Agreement." *Id. at* 6:2-4.]

- "[E]ach time DRS received a repayment and failed to either set it aside for the Plaintiff or pay it over to the Plaintiff, DRS breached its obligations to the Plaintiff as a third-party

-6-

has specifically argued that DRS breached its obligations well before MLG filed its fee application:

> The Defendants do not explain why DRS' failure to respect its subordination by turning over the repayments to [MLG] was not a breach of their subordination obligation, other than to argue that because the [MLG's] fees had not yet been allowed by a Court order, no payment to [MLG] was required. <u>But this ignores the language of Section 2.13, which states that subordination shall be honored either "by payment of or provision for" professional fees. Thus, if fees had not yet been approved by the Court, this did not absolve DRS of its subordination obligation – rather, it required that the funds be set aside for professional fees once approved. That is precisely why "or provision for" was included in Section 2.13 – to avoid gutting the subordination simply by prematurely paying DRS prior to allowance of the Plaintiff's fees. DRS' failure to do make provision for the fees by setting them aside pending fee approval, breached its subordination obligation even though professional fees had not yet been allowed.</u>

Plaintiff's Opposition to Defendants' Motion for Summary Judgment at Docket 40 at 6:5-15 (emphasis added).

The court is therefore not persuaded by MLG's argument that it could not have reasonably discovered DRS's breaches when the payments were made as they were "quintessential secret breach[es]." *See* MLG's Post-trial Brief at Docket 102 at 3:5. MLG admits in paragraph 30 of its complaint that it provided DRS an invoice three days prior to the first repayment, showing that MLG had already incurred fees in excess of $127,000 *after* application of its retainer. MLG also states in paragraph 34 that Debtor provided accounting to DRS of the fees incurred by MLG, primarily through its monthly operating reports. Yet these same monthly reports (filed on the docket by MLG) also disclosed the repayments by Debtor to DRS, so MLG was on notice of the

---

beneficiary under the DRS Loan Agreement." *Id.* at 6:20-22.

-7-

repayments as early as February 20 (when the January monthly report was filed). Additionally, MLG prepared and signed a disclosure statement filed on February 29 stating that "[w]ith court approval the Debtor has borrowed and partially repaid funds under the loan agreement with DRS ever since."[8] Thus prior to February 24, 2008, MLG knew about the January Payment and the February Payment and knew that no provision had been made for its fees from those repayments. Consequently, the court concludes that MLG's claim for recovery of the January Payment and February Payment to DRS is time-barred.

B. <u>Damages</u>

The extent of MLG's damages is obvious, namely the $150,000 DRS received as the April Payment. It has not repaid that amount to MLG nor has MLG recovered that amount or any additional amounts from Debtor. Thus, except for the remaining affirmative defense of fraud as discussed below, MLG has established all of the elements of the claim against DRS that is not time-barred. Specifically, the Loan Agreement constituted a contract and MLG was a specific beneficiary of it. MLG performed in that it earned fees later allowed by the bankruptcy court. DRS did not provide for MLG's superior right, and the damages are as indicated.

C. <u>Fraud Defense</u>

Mr. Meyers told Krystal and DRS to obtain counsel to advise

---

[8] At a hearing on July 27, 2012, Mr. Meyers of MLG made a point that DRS knew about the first bill and knew it was increasing. By the same token, Mr. Meyers knew (or should have known, given the court documents that he signed and filed) that DRS had received the Cash Repayments even though no provision had been made to pay the significant fees already incurred by MLG.

-8-

them of their rights and responsibilities under the Loan Agreement and they chose not to do so. MLG was under no particular duty to DRS or Krystal to advise them how to protect their rights before entering into the Loan Agreement. In fact, Section 8.21 of the Loan Agreement recites that each party has been represented by counsel to the extent each party deemed necessary. DRS and Krystal were specifically cautioned how to protect their interests and they blindly went forward on their own and entered into the Loan Agreement and in particular Section 2.13.

In addition to these clear warnings to DRS and Krystal, Mr. Meyers specifically informed them that his fees would have priority under the Loan Agreement. This information was provided before DRS advanced any funds under the Loan Agreement (in fact the actual Loan Agreement was not signed for quite some time after DRS began advancing funds). Attorney Russell Pollock, who represented Debtor, confirmed that Mr. Meyers told DRS, Krystal and others that MLG's fees would have priority over DRS. That testimony is corroborated by the similar testimony of Mr. Sprecher, an insider of the Debtor who was very much involved in the management of the Debtor's business.

At trial Krystal tried to persuade the court that his interpretation of Section 2.13 was that the trustee would have priority for its fees. He does not identify what trustee he was referring to, nor does he explain with any success that the actual language of Section 2.13 somehow was limited to any trustee.

This after-the-fact revisionist history is inconsistent with the testimony of the three witnesses described above, and the late 2008-early 2009 acknowledgments by Krystal found in Exhibits 41

-9-

and 42 to the effect that Mr. Meyers had informed everyone that MLG's "... legal fees to carry on with the court filing had a priority..." Other excerpts of the e-mail exchanges in those two exhibits are consistent with Krystal's clear knowledge that MLG had priority for its fees.[9]

Going back in time, even when the Loan Agreement was in the early stages of being negotiated, Mr. Meyers sent Krystal and others an e-mail on November 27, 2007, that stated that amounts owed to DRS would be secured by Debtor's assets, but "subject to the same exceptions and subordinations (but also including subordination to the Creditors Committee's reasonable attorneys' fees) ..." Krystal responded that the terms as outlined in that e-mail were acceptable.

While the exchange of e-mails in Exhibits 41 and 42 occurred well after Debtor made the payments to DRS (while MLG was incurring fees), they prove that several years ago Krystal (and thus DRS) knew of MLG's priority. Any plea of ignorance several years later is not credible.

MLG's failure to provide DRS with all of the monthly statements it had agreed to does not mean it loses the benefit of the DRS subordination. Krystal and DRS had sufficient information to know of substantial fees being incurred by MLG early on. For example, by January 21, 2008, MLG had advised Krystal that it had already incurred, as of December 31, 2007, fees totaling $127,967.90. Krystal was well aware of the expensive legal

---

[9] The fact that Krystal expressed concerns about the extent of MLG's fees does not undermine the acknowledgment that MLG's fees did have priority under the Loan Agreement.

-10-

activity in the Debtor's chapter 11 case and certainly had specific business acumen and experience to understand that those fees were continuing to mount at a rapid pace.

In addition to e-mail correspondence, Mr. Meyers had several communications with Krystal and kept him informed of the expensive litigation going on in Debtor's bankruptcy case with Bank of America. Krystal attended various business meetings at the Debtor's offices, and was aware of much of what was going on in the Debtor's case.

It is unfortunate that DRS' expectations of recovery of its financing of Debtor were unfilled and that it lost a substantial amount of money. And it is equally unfortunate that MLG will recover only a small percentage of the fees it earned during the case. But for DRS to blame MLG and Mr. Meyers and accuse them of fraud is unvailing. Although Krystal may not have been schooled in transactions of this nature, he comes across as successful business person who has accomplished a great in his career, being conversant in several languages and operating DRS successfully since 1974. That he made no prior loans to an auto dealer, and had no experience with loans secured by personal property, speaks more to his naivete in entering into this transaction than anything else.

Obviously Krystal relied upon his business acquaintance, Mr. Tomera, who set him up to make this loan, and perhaps he and others fully believed that Debtor would successfully prosecute a claim against Bank of America for what they believed to be a viable cause of action, but that does not translate into fraud by MLG or Mr. Meyers nor exonerate Krystal from his own decision not

-11-

to employ counsel and not to read carefully and understand the terms of the Loan Agreement.  Perhaps had he done so he would have insisted on excluding or eliminating Section 2.13.  He cannot now claim that he understood the subordination provisions to apply only to someone such as the United States Trustee's fees.  In fact, the very addition of the Creditors Committee to the subordination provisions, compared to the two prior DIP loan agreements, put Krystal on notice that the subordination provisions of Section 2.13 were being expanded rather than contracted in the Loan Agreement.

Krystal's belief that he was protected by Section 2.14, namely that he would not have pay any other parties' attorneys' fees, is equally unpersuasive.  That provision protects DRS from being obligated to pay fees of Debtor's counsel; it does not insulate it from being required to reimburse a party who is the beneficiary of the subordination provisions of Section 2.13, even though in fact the amounts unpaid represent attorneys' fees.  This dispute between MLG and DRS is an inter-creditor issue and not the shifting of attorneys' fees.

In sum, Mr. Meyers did not defraud Krystal or DRS; he had no intention to defraud them; DRS has offered no proof of any affirmative misrepresentations by Mr. Meyers, and there is no evidence that he made any active concealment of facts known only to him such that any omission of material facts would amount to some kind of fraudulent conduct.  The affirmative defense of fraud fails completely.

Case: 12-03030   Doc# 103   Filed: 06/03/13   Entered: 06/04/13 08:47:33   Page 12 of 13

### III. CONCLUSION

This Memorandum Decision and the court's prior rulings dispose of all claims by MLG against DRS. If MLG wishes to pursue Krystal personally under an alter ego theory, it will be limited to recovery for the April Payment only. If MLG decides not to pursue Krystal, it should prepare, serve and upload a form of judgment consistent with this Memorandum Decision and at the same file a dismissal of all claims against Krystal. If on the other hand, MLG wishes to pursue Krystal, the court will conduct a status conference on June 28, 2013, at 2:00 P.M. to discuss further conduct of this adversary proceeding.

**END OF MEMORANDUM DECISION**